FIRST STATE SAVINGS BANK OF BRECKENRIDGE v. WEBSTER.

BILLS AND NOTES—FILLING BLANKS—LIABILITY OF MAKER.

The maker of a note, who carelessly leaves room for an altera-tion to be made without defacing the note or exciting the suspicion of a careful man, will be liable upon it to a *bona fide* holder without notice, when the opportunity he has afforded has been embraced. So *held*, where the date line of a note payable "one year after January 1, 1898, after date, with interest from date thereof," was left blank, upon the under-standing that the note would bear interest only from January 1, 1898, and the blank was subsequently filled so that the note bore date October 16, 1896; the maker being held liable to a *bona fide* holder for interest from the date so inserted.

Error to Gratiot; Daboll, J. Submitted June 8, 1899. Decided September 12, 1899.

*Assumpsit* by the First State Savings Bank of Breck-enridge against Charles E. Webster and others upon cer-tain promissory notes. From a judgment for plaintiff, defendants bring error. Affirmed.

*John T. Mathews*, for appellants.

*George P. Stone*, for appellee.

MOORE, J. The defendants appeal from a judgment rendered in favor of the plaintiff. The case was tried before the circuit judge, who, at the request of the parties, made findings of fact and conclusions of law. We cannot do better, to show what is involved in the case, than to reproduce the substance of these findings and conclusions:

"1. On the 2d day of October, 1896, the defendants purchased of McLaughlin Bros. a horse, at the agreed price of $2,600, and entered into the following written and printed agreement with the said McLaughlin Bros.:

"'ITHACA, MICH., Oct. 2, 1896.

"'Name of stallion, *Ophir, 1740.*

"'McLaughlin Bros. agree to sell the above-named stallion, for $2,600, to the other undersigned subscribers, who, wishing to improve their stock, agree to pay McLaughlin Bros. $100 for each share in said stallion. Capital stock, *$2,600.* No. of shares, *26.* Payments to be made in cash, or one-third in one year, one-third in two years, and one-third in three years *after January 1st, 1898*, secured by joint and several notes, with interest.'

"This contract was signed by McLaughlin Bros. and all of the defendants in the transaction of the sale of the horse. William McLaughlin claimed himself a member of the firm of McLaughlin Bros., and Mr. McLaughlin, at the time he procured the signatures of the defendants to the aforesaid contract, represented to them that by its terms interest was not to commence upon the purchase price of the horse until January 1, 1898. It was understood by the defendants that interest did not commence to run until January 1, 1898. The defendants had the opportunity to read the contract before they signed the same, but it was read over to them by McLaughlin, with the interlineation, 'after January 1st, 1898,' after the last printed word, 'interest,' and so explained by him to all persons to whom it was presented for signatures.

"2. Afterwards, and on the 16th day of October, 1896, the defendants executed to the said McLaughlin Bros. three negotiable promissory notes, in words and figures as follows:

"'$866.00.                                    ——, 189—.

"'One year after January 1st, 1898, after date, for value received, we jointly and severally promise to pay to McLaughlin Bros. or order eight hundred and sixty-six dollars, at the Ithaca Savings Bank, with interest at 6 per cent., payable annually, from date thereof.'

"—The other notes being precisely the same as the one here shown, except they were given for $867 each, and were payable in two and three years, respectively, from January 1, 1898. The signatures of each of the defendants appear upon each of the notes.

"3. At the time the notes were executed and delivered, the date line was left in blank, nothing being therein except the figures "189—,' as printed therein; and the fact that the notes contained no date in the place where the date usually appears in the notes was noticed by the defendants, and their attention called to it, before they executed

the notes, but it was explained to them that the date already in (January 1, 1898) was the date of the notes, and that it was a complete note without any other date, and, at the time of the transaction of the giving of the notes, William McLaughlin informed the defendants that the notes, as drawn, did not commence to draw interest until January 1, 1898. Some of the defendants informed Mr. McLaughlin that they desired to obtain counsel upon the notes before signing them, and thereupon took them to an attorney-at-law at Ithaca, Michigan, and afterwards the defendants executed them as drawn.

"4. The notes in question were on the 16th or 17th day of October, 1896, taken into the office of the Ithaca Savings Bank by William McLaughlin, and at that time the date line in the note was filled in with the date, ' Ithaca, Mich., October 16, 1896.'

"5. Afterwards, and on or about the 11th day of November, 1896, the plaintiff purchased the notes of McLaughlin Bros., and, in the transaction of such purchase, McLaughlin Bros. sent the notes to the Ithaca Savings Bank, with the instruction to deliver them upon the payment of a certain amount of money; and in this transaction one James B. Crawford, who was at the time president and a member of the board of directors of the plaintiff bank, negotiated the purchase for the plaintiff, under instructions by telephone from the plaintiff to the effect that he was authorized to purchase the notes in question at not exceeding $2,300. * * * Pursuant to such instructions, James B. Crawford bid $2,230 for the notes, and the bid was accepted; and the plaintiff sent a draft to James B. Crawford, who paid for the notes, and sent them to the plaintiff.

"6. At the time of the negotiation and purchase of the notes by plaintiff, James B. Crawford knew that the notes were given for the purchase price of the horse, and the fact that it was a joint-stock arrangement, and notes were to be given for the purchase price. He had no knowledge that the notes contained no date at the time they were executed, or that they had been subsequently dated, and had no knowledge of any fraud or deception connected with the transaction of the sale of the horse or taking of the notes.

"CONCLUSIONS OF LAW.

"1. The date of the notes, while not necessary to their

validity, was necessary to their free and unobstructed circulation as negotiable paper.

"2. The execution of the notes, leaving the date line in blank, gave implied legal authority to any holder to insert in the blank so left unfilled the true date of their execution.

"3. The evidence of what was said between the parties at the time of the execution of the notes is incompetent to contradict or modify in any manner their terms.

"4. By their terms, the notes draw interest from their date, October 16, 1896, at 6 per cent. per annum, payable annually.

"5. The plaintiff is a *bona fide* holder of the notes, for a valuable consideration, before maturity, without notice of any defense to them."

Counsel for defendants contends for the following propositions:

"(1) By the exact wording of the notes, there is nothing due of interest, because the note reads, interest payable annually from date 'thereof,' not 'hereof.' The word 'thereof' refers, in point of time, to a date other than the day at which the thing is being done. In other words, the word 'thereof,' defined, means 'of that,' 'of it,' 'from that,'" which, by the phraseology of the note, refers to January 1, 1898.

"(2) We insist that as the note had no date, except January 1, 1898, when signed, and it being understood by all parties to the transaction that that was the date of the note, and that no other date was needed or should be added to make it a complete instrument, and it being found that the date October 16, 1896, was subsequently added without the consent of the makers, and plaintiff having failed to show affirmatively that it was a purchaser for value, without notice, etc., it cannot recover.

"(3) We insist that if the words 'date thereof' are construed to refer, in the printed form of the notes, to October 16, 1896, that then the addition of that date without the consent of the makers increases the obligation of the makers, and makes the paper false, forged, and counterfeit, and therefore void in the hands of anybody."

We do not think any of these propositions can be sustained. According to the finding of the circuit judge, which finding is sustained by abundant testimony, the

notes were not dated when signed.   It must be remembered these notes were made in October, 1896, and were bought by plaintiff in November of that year.   Suppose they had read, "Ninety days after date, for value received, we jointly and severally promise to pay;" would it be said the notes bore a date?   If that question must be answered in the negative, how can it be said that notes made in October, 1896, reading, "One year after January 1st, 1898, after date, for value received, we jointly and severally promise to pay," are notes dated January 1, 1898?   We think the words, "one year after January 1st, 1898," indicate, not the date of the note, but the date when payment is to be made, and that it would be so regarded by any bank to whom they should be presented for negotiation, especially as the blank preceding these words had been filled with a prior date.   The rule in relation to filling in blanks like the one in question is stated in 2 Daniel, Neg. Inst. (4th Ed.) § 1405, as follows:

"There is a general principle which pervades the universal law merchant respecting alterations, which, when they are material, will, as we have seen, vitiate the bill or note, even in the hands of a *bona fide* holder without notice,—a principle necessary to the protection of the innocent and prudent from the negligence and fraud of others.   That is that when the drawer of the bill or the maker of the note has himself, by careless execution of the instrument, left room for any alteration to be made, either by insertion or erasure, without defacing it or exciting the suspicions of a careful man, he will be liable upon it to any *bona fide* holder without notice, when the opportunity which he has afforded has been embraced, and the instrument filled up with a larger amount, or different terms, than those which it bore at the time he signed it.   The true principle applicable to such cases is that the party who puts his paper in circulation invites the public to receive it of any one having it in possession with apparent title, and he is estopped to urge an actual defect in that which, through his act, ostensibly has none.   'It is the duty of the maker of the note to guard, not only himself, but the public, against frauds and alterations, by refusing to sign negotiable paper made in such a form as to admit of fraudulent practices upon them with ease, and

without ready detection.' The inspection of the paper itself furnishes the only criterion by which a stranger to whom it is offered can test its character, and, when the inspection reveals nothing to arouse the suspicions of a prudent man, he will not be permitted to suffer when there has been an actual alteration."

This section is quoted with approval in the recent case of *Weidman* v. *Symes*, 120 Mich. 657, where there is a discussion of the authorities.

The defendants had every opportunity to know, and did know, how the notes read, when they were signed by them. It was their duty to see that the date line was so filled in that an unsuspecting *bona fide* purchaser should not be deceived when the note was presented to him for negotiation. Failing to do this duty, they cannot complain, now that the note is in the hands of a *bona fide* holder. The circuit judge properly disposed of the case.

Judgment is affirmed.

The other Justices concurred.